UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. S1-4:14CR00088 RWS (SPM) |
| | ) |
| DIONNE LAMONT GATLING, | ) |
| ANDRE ALPHONSO RUSH, | ) |
| TIMOTHY LAMONT RUSH, and | ) |
| LORENZO GIBBS, | ) |
| | ) |
| Defendants. | ) |

**GOVERNMENT'S AMENDED MEMORANDUM IN SUPPORT OF
MOTION FOR CLOSURE OF COURTROOM DURING THE TESTIMONY OF CS1**

COMES NOW the United States of America, by and through Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Dean R. Hoag and Michael A. Reilly, Assistant United States Attorneys for said District, and hereby, in support of its Amended Motion for Closure of Courtroom, states as follows:

### INTRODUCTION

On or about October 6, 2016, the Government filed its Motion for Courtroom Closure and Memorandum in Support of Motion for Closure of Courtroom During the Testimony of CS1 (Docs. # 313 and 314, respectively). The Memorandum in Support of Motion for Closure of Courtroom During the Testimony of CS1 ("Memorandum in Support," Doc. # 314) was filed under seal to protect the identity and safety of CS1 and to preserve the integrity of ongoing investigations. The Government now files this Amended Memorandum as a public document with certain redactions to protect CS1 and to preserve the integrity of the investigations.

This is an organized crime case that involves the "Black Family Mafia" (BMF) and its established affiliates, the Gatling DTO, operating in St. Louis, Missouri. All defendants are charged with multiple violations of narcotics distribution. Defendant Gatling is also charged with continuing criminal enterprise.

Significantly, Defendants Gatling and Rush are charged with homicides involving a witness and prospective witness. Both of these killings were orchestrated by Defendant Gating. "CS1," a female confidential source of the Drug Enforcement Agency, provided integral information to establish probable cause for the initial indictment in this matter. Since Defendant and BMF discovered this witness's name and phone number, CS1 has been the victim of a steady stream of threats, as recently as August 29, 2016. CS1 understandably feels threatened and intimidated – emotions that could preclude or significantly hinder highly probative testimony – by the actions of Defendant Gatling and BMF.

Due to an unusual set of circumstances involving allegations of misconduct by DEA agents, this matter is currently set for a Franks evidentiary hearing on October 17, 2016. The United States anticipates CS1 will be called as an essential witness with respect to defendants' allegations challenging the information contained in the affidavit in support of the initial Title III application in this case.

CS1 has urged that the courtroom be closed during her testimony to ensure her personal safety because CS1 believes that an open court proceeding would allow BMF and Gatling affiliates who are unfamiliar with her personal appearance to learn what she looks like, thereby increasing their ability to target her with retaliatory violence. Defendant Gatling, BMF, and their affiliates are capable of causing harm to CS1 based on prior conduct. This is demonstrated by Gatling's ordering of the murder of Theodis Howard in retaliation for Howard's previous cooperation against his

2

Gatling's brother. Moreover, Defendant Gatling dictated a post on social media August 29, 2016 identifying CS1 by name and calling for persons to attend the hearing. In a recorded phone call related to this intimidation tactic, Gatling stated words to the effect that he expected the case to be dismissed, and that he would be coming back "with a vengeance."

Based upon the following facts and legal standards, nothing short of complete court closure during CS1's testimony will ensure CS1's safety from Defendant Gatling and his criminal enterprise.

## FACTS

The case and investigation into defendants' criminal organization has been building over a decade. Defendant Gatling's violent criminal history stretches back even further. The following is not a complete recitation of the facts in this matter, but will instead focus on those facts pertinent to the necessity of closing the courtroom for CS1's testimony.

### I.    DEFENDANT GATLING'S HISTORY OF KILLING WITNESSES VALIDATES CS1'S FEAR

The most intimidating threats are those from sources that have demonstrated a willingness to carry them out.

#### 1.    Retaliatory Murder of Witness Theodis Howard

Defendant Gatling orchestrated the murder of Theodis Howard on April 5, 2010, in retaliation for Howard's cooperation in a federal drug trafficking case against Dionne Gatling's brother, Deron Gatling.  Defendant Gatling is implicated by virtue of circumstantial evidence pertaining to Howard's cooperation against Deron Gatling, coconspirator statements, and the presence of Gatling's motor vehicle, a Volkswagen, at the crime scene.

In 2002, detectives began investigating a drug trafficking organization operating within the Eastern District of Missouri. During the course of the investigation, confidential sources purchased

3

controlled substances from victim Howard. At the conclusion of the investigation, forty-one individuals were charged in the Eastern District of Missouri for offenses related to the operations of the drug trafficking organization. Victim Howard was charged along with Deron Gatling, Dionne Gatling's brother. During the course of the prosecution, victim Howard cooperated and the United States Attorney's Office filed a motion for downward departure prior to his sentencing.

Victim Howard gave specific information related to the drug trafficking activities of Deron Gatling, who was victim Howard's source of supply. Victim Howard agreed to testify against his co-conspirators, however, none of them went to trial. On February 21, 2006, Howard was sentenced to a term of 72 months' imprisonment after the judge granted the government's motion for downward departure based upon victim Howard's cooperation. In the same case, Deron Gatling was sentenced to 210 months' imprisonment.

In 2010, victim Theodis Howard was released from custody and was serving the remainder of his sentence in a halfway house. Howard told an associate of Defendant Dionne Gatling that he had an appointment at a medical clinic on April 5, 2010. A co-conspirator to the murder called a number of clinics, posing as Howard, in order to determine which clinic Howard would be going to. Howard had a health care appointment at the Grace Hill Clinic at 2524 Hadley Street in St. Louis, Missouri.

On April 5, 2010, Dionne Gatling drove Andre Rush, Derrick Clemons and Raymond Jones to the Grace Hill Clinic. Andre Rush was to point out the victim, Theodis Howard, to Clemons and Jones so that they would shoot the right person. Gatling told Rush, Clemons, and Jones that he wanted Howard killed because he "snitched" on his brother, Deron Gatling.

Victim Howard's sister dropped him off at the clinic. There were also two children in the car, including Howard's minor daughter. When Howard walked towards the clinic door, Andre

Rush approached him and gave him a hug. Clemons covered his face with a scarf, walked up to Howard, and shot him in the head. Jones also approached Howard, stood over his body, and fired several shots. Rush, Clemons, and Jones then ran to Gatling's car, a Volkswagen, and they all drove away. Gatling drove to Illinois and the two guns were discarded in a sewer before they all drove back to St. Louis.

On March 8, 2014, Andre Rush admitted to homicide investigators that he pointed out Theodis Howard to the two triggermen. The Government will corroborate that the vehicle depicted on videotape in flight from the scene, was consistent with a vehicle registered to Defendant Gatling.

### 2. Retaliatory Murder of Prospective Witness Terrance Morgan

In August 2012, DEA began an investigation into the drug trafficking activities of Defendant Gatling, who was distributing narcotics within the Eastern District of Missouri. Andre Rush, Timothy Rush, Lorenzo Gibbs, and victim Terrance Morgan assisted in the distribution of the narcotics throughout the St. Louis area. Defendant Gatling orchestrated the murder of Morgan to prevent him from cooperating with law enforcement officers. A witness has identified Andre Rush at the scene of the Morgan murder. Andre Rush, in a post-arrest statement, implicated Gatling in the murder.

In 2013, the investigation into the drug trafficking activities of Gatling, Andre Rush, Timothy Rush, Lorenzo Gibbs, Terrance Morgan, and others concluded. On May 1, 2013, investigators met with Kristi Ridings, Gatling's attorney, regarding the evidence against Gatling. Investigators told Ridings that Gatling, Timothy Rush, Andre Rush, Gibbs, and Morgan had been intercepted over wiretaps and monitored phone calls participating in the distribution of narcotics.

Investigators also told Ridings about surveillance and seizures that occurred during the course of the investigation.

Also on May 1, 2013, investigators spoke with victim Morgan and advised him that he was the target of a federal narcotics investigation. Morgan agreed to meet with investigators. Investigators asked Morgan when he had last spoken to Defendant Gatling and his response was that he (Morgan) "[knew] nothing."

On May 2, 2013, Morgan was murdered in an alley at or near 2503 Ohio in St. Louis City by gunshots to the back of the head and the neck. Morgan was unarmed and nothing appeared to have been taken from him.

A witness has identified Andre Rush as being present at the scene of the Morgan murder. Andre Rush, in a post-arrest statement to homicide investigators on or about March 7, 2014, implicated Dionne Gatling in the Morgan murder. Andre Rush stated that Gatling was concerned that Morgan "couldn't hold water," meaning that Morgan may talk to the police. Andre Rush admitted during a polygraph examination to shooting Morgan at Defendant Gatling's behest.

**II.     Facts Supporting Specific Threats to CS1's Safety**

There has been a pattern of threats against CS1, whose identity Defendant Gatling surmised from an affidavit in support of the initial Title III application. In addition, there is an ongoing [Name of investigative agency redacted] investigation that was the subject of a protective court order, which defendants have violated by disseminating information about the investigation and CS1.

    **1.     Telephone Threats**

On March 13 and March 16, 2015, CS1 received threatening phone calls from a caller utilizing telephone number (773) 512-XXXX. CS1 reported that the caller stated words to the

6

effect of, "How does it feel to be a paid informant?" and then added, **"you're dead."**  The events are documented in DEA reports, and have been corroborated by toll analysis with the victim's phone, and the subjects' phones, and photographs that CS1 took of her caller ID.

Subsequent DEA investigation revealed that (314) 368-XXXX, subscribed to in the name of [Gatling family member (#1) name and address redacted], was in contact with telephone number (773) 512-XXXX, subscribed to in the name of [Gatling family member (#2) name and address redacted], during the time frame of the threatening phone calls.  It is believed that [name of Gatling family member (#1) redacted] is Defendant Gatling's [relationship of Gatling family member (#1) redacted], and that [Gatling family member (#2) name/association redacted].  The investigation also revealed SMS text contacts between (773) 512-XXXX and a phone utilized by Defendant Gatling during the original narcotics distribution investigation.

    **2.**    **Threatening Encounter**

On March 17, 2015, CS1 was contacted in a suspicious manner by an unknown male when CS1 was leaving her place of employment.  CS1 took evasive actions to avoid being followed.  The events are documented and corroborated in DEA reports.

Based upon the totality of the circumstances, it is reasonable to infer that Defendant Gatling and his relatives and/or associates orchestrated the threat upon CS1.  This is consistent with Defendant Gatling's history of violence against witnesses and prospective witnesses.

    **3.**    **Threat from "Bey-Bey"**

In or about March 2015, Sammy Jefferson, aka "Bey-Bey," an associate of Defendant Gatling, also conveyed a direct threat to CS1 and her daughter.

In or about January 2008, the Jefferson was sentenced to a term of 235 months in prison for the offenses of conspiracy to distribute and possess with the intent to distribute cocaine and

marihuana and distribution of cocaine in cause number 4:07CR184 ERW.  It is believed that Jefferson may have utilized the BOP e-mail system to convey the threat.  Unfortunately, CS1 did not directly notify the Government of the threat immediately, and it is unlikely that the threat has been preserved on the BOP e-mail system.  However, BOP records do corroborate the existence of a relationship and contact between CS1 and Jefferson.

Jefferson communicated the following:

> "listen baby ! i'm not trying to get caught up in this b/s  all i love meech & [CS 1 identity redacted] 2 death as well as  cuff, so whatever is going on is between them, far as u i've grown to love u & respect u as my friend,mother & confidant....... like i said before i know this  shit gotta be tough on u whatever happen in your past i'm all ears but i love u for u, true bill all i'm saying is u stay out of this crap if u can help cuff do  so but be forever mindful u got a [reference to family member redacted], **don't deprive [family member reference redacted]of life b/c u have gotten caught up** in some gangsta  shit, i know meech loves u too & don't want nothing to happen to u but baby this isn't your livelihood so clear your name & move forward with being a [reference to family status redacted]/ independent woman ! don't think for one minute that i'm against u baby i just ask that u be upfront with me about everything no matter what b/c i  be there when the world turn their back on u, true bill........ that's all for nowwhen u ready to come & expalin things to me just let me know if u want me to call  let me know ! ttyl, love always Bay-Bay"

4.      **Protective Order**

On February 9, 2016 this Court issued a protective order for documents relating to ongoing [names of investigative agencies redacted] investigations. The Court found that "there is significant risk that an ongoing criminal investigation may be compromised if the [names of investigative agencies redacted] disclosures are disseminated in a manner other than that which is stated in this Order." Also, likely influenced by defendants' history of retaliation against witnesses, the Court stated, "Based on the record before this Court, I also find **there is a serious potential of harm to individuals . . . if information is disseminated improperly**." (Emphasis added).

8

An important aspect of the protected information is personal identifying information of CS1. It was ordered that defense counsel could show/discuss the Disclosures with defendants, but must admonish their clients from disclosing the information to anyone else. The United States has a reasonable belief, based on the threats outlined herein, that Defendant Gatling has ignored the Court's protective order and disseminated personal information regarding CS1, including CS1's name. This has created the exact risk to CS1 that the Court hoped to avoid by issuing the protective order – "a serious potential of harm."

5.      **Social Media Threat/BMF Call-to-Action**

On August 29, 2016, Defendant Gatling directed a posting on social media that identified CS1 and encouraged BMF affiliates to attend the upcoming court hearing on October 17, 2016, during which CS1 will be called as a witness. A review of consensually monitored jail phone calls reveals that Defendant Gatling had a phone conversation with the user of (773) 512-XXXX, the same phone number involved in the threats in March 2015. On August 29, 2016, following the video deposition of CS2, which was attended by all defendants, Defendant Gatling dictated verbatim the statement below directly to the user of (773) 512-XXXX for publication on social media. Investigators believe that Gatling's family member [name redacted], then posted the following information on social media:

> [Name of posting party redacted]
>
> Were anticipating the release of Dionne Gatling aka CUFFY whose been falsely accused and imprisoned! [BMF association of CS1 redacted], [FIRST AND LAST NAME OF CS1], a government informant since 2010, officially known as Confidential Source 1 in the case of the USA vs Dionne Gatling aka Cuffy. Watch as [LAST NAME OF CS1] continue to spread her web of lies and perpetuate fraud on the courts. As she alleges on the BEHEST OF, or instructed by, Big Meech to lead a large scale drug conspiracy involving Cuff, Big Meech, and a Hispanic male, Fidel Suarez. This REAL LIFE drama involving sex, murder, crooked federal agents, an OVER

9

> zealous prosecutor, and MUCH MORE. All played out in the downtown St. Louis Federal Court House October 17, 2016. DONT MISS IT!

In another recorded jail phone call immediately preceding Gatling's verbatim dictation of the threat, Gatling stated words to the effect that he expected the case to be dismissed, and that he would be coming back "with a vengeance."

**6.  CS1 is Fearful for Her Personal Safety and is Requesting that the Courtroom Be Closed for Her Testimony**

Counsel for the United States has been in communication with CS1 who has represented that she is extremely fearful of retribution and/or intimidation by the Gatling DTO/BMF. She has been extremely forceful in her requests that the courtroom be closed for her testimony

Additionally, CS1 remains a critical witness in the [names of investigative agencies redacted] investigations. Defense counsel will almost certainly ask CS1 about the facts underlying those investigations, which are ongoing. Were it not for the unique situation here, the materials and facts surrounding those ongoing investigations would not be disseminated at all, much less made public.

Accordingly, the above facts demonstrate:

1. Defendants and BMF organization already know CS1's name and identifying information. The only unknown is her physical appearance.
2. Defendants and the BMF organization have killed witnesses in the past.
3. Defendants had victim Morgan killed based only upon suspicion of cooperation, whereas CS1's cooperation is confirmed.
4. CS1 feels extremely threatened and intimidated and is requesting that the Court be closed for her testimony.

10

5. This fear/intimidation could greatly limit CS1's ability to testify, or even cause her not to testify for fear of violent retaliation.

6. There are ongoing [names of investigative agencies redacted] investigations regarding which CS1 has critical information and is an essential witness.

7. CS1's testimony is highly probative in the matters before the Court as to the suppression and Franks hearing.

In light of these factors, the courtroom should be closed during the testimony of CS1 only to protect the safety of CS1.

## LEGAL STANDARD FOR COURT CLOSURE

The right to a public trial is protected by the Sixth Amendment. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial …). However, that right is not absolute. *United States v. Thompson*, 713 F.3d 388, 394 (8th Cir. 2013). The right to must "give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Thompson*, 713 F.3d at 394. In certain circumstances, this right is limited by excluding certain individuals, within the discretion of the trial court. The "presumption of openness" may be overcome if the judge is convinced a compelling interest exists that needs protecting, considers reasonable closure alternatives, ensures the closure is narrowly tailored, and makes findings sufficient to support the ruling. *Waller v. Georgia*, 467 U.S. 39, 45 (1984).

Decisions to close the courtroom are reviewed for an abuse of discretion. *Thompson*, 713 F.3d at 394. In *Waller*, the Supreme Court provided a four-part test to determine whether courtroom closure during a suppression hearing was proper. *Waller*, 467 U.S. at 48; *see also*

*Presley v. Georgia*, 558 U.S. 209, 214 (2010) (applying same test to courtroom closure during voir dire).

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48.

This test has been recognized and utilized by the Eighth Circuit. *Thompson*, 713 F.3d at 395; *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994).

### 1. Overriding Interest

The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced.[1] Integrity of an ongoing investigation, and emphatically, witness safety, are certainly overriding interests across jurisdictions. *See Presley v. Georgia*, 558 U.S. 209, 215 (2010) (recognizing that safety concerns and threats could certainly be concrete enough reasons to warrant closing a trial)); *Martin v. Bissonette*, 118 F.3d 871, 875 (1st Cir. 1997) (affirming partial closure of courtroom where witness had been intimidated by defendant and family); *Woods v. Kuhlman*, 977 F.2d 74, 75-76 (2d Cir. 1992) (affirming partial closure where prosecutor informed judge that a witness was terrified of retaliation by family); *United States v. Hernandez*, 608 F.2d 741, 747-48 (9th Cir. 1979) (upholding public exclusion from courtroom during examination of witness who was in fear of safety after being threatened and there was a "demonstrated need to protect the witness from threatened harassment or physical harm"); *United States v. Addison*, 708 F.3d 1181,

---

[1] Where only partial closure is contemplated, there need only be a showing of a "substantial reason" for the partial closure, as opposed to *Waller*'s "overriding interest requirement. *Thompson,* 713 F.3d at 395 (citing *United States v. Petters*, 663 F.3d 375, 383 (8th Cir. 2011)). Here, the United States seeks to exclude all spectators and thus, it is a complete closure necessitating use of the "overriding interest test." *See United States v. Thunder*, 438 F.3d 866, 868 (8th Cir. 2006) (explaining that the exclusion of the members of the public and the press during a child victim's testimony is a total closure of the courtroom).

1187 (10th Cir. 2013) (affirming partial closure based on witness intimidation alone and collecting authorities).

The Eighth Circuit has also recognized the importance of protecting a witness's safety in this context. *See United States v. Petters*, 663 F.3d 375, 383 (8th Cir. 2011) (The government's interest in protecting the integrity of the WITSEC program and the safety of witness and his family were substantial reasons justifying the restrictions imposed in the pretrial hearing); *United States v. Thompson*, 713 F.3d 388, 396 (8th Cir. 2013) (The government's interest in protecting its witness and the witness's concern for his own safety justify the partial closing in this case).

While several of the cases listed above deal with partial closure, their emphasis on the importance of witness safety as a concern in restricting public access to proceedings is no less instructive. Here, the United States has furnished information and evidence demonstrating not only a substantial reason for partial closure, but abundant justification for the finding of an overriding interest justifying the limited closure suggested herein.

In addition to the safety concerns of CS1, which alone constitute an overriding interest, closure is required here to ensure no adverse effect on CS1's ability to effectively communicate her testimony absent extreme trepidation about her physical appearance being revealed to Gatling DTO/BMF affiliates. *See United States v. Yazzie*, 743 F.3d 1278, 1289 (9th Cir. 2014) (noting that child victims' abilities to effectively communicate their stories at trial would be adversely affected absent closure due to youth and tension of defendant being a family member).

A third overriding interest is the interest in CS1's participation in and the integrity of the ongoing [names of investigative agencies redacted] investigations. This Court has already recognized the importance of protecting the confidentiality of materials related to that investigation

13

by entering a protective order (which has subsequently been violated by the call to action launched against CS1 in social media).

These overriding interests are likely to be substantially prejudiced by allowing an open proceeding. Once CS1's physical appearance is revealed to Gatling DTO/BMF members, the bell cannot be unrung and her safety is compromised. Moreover, her overarching justified fears could impact her ability to testify and thus thwart the truth seeking function of the hearing. Finally, any unauthorized disclosures to the public related to the ongoing investigations could do irreparable harm.

### 2. Narrowly Tailored

The closure must be no broader than necessary to protect the overriding interest. Here, the Government requests closure only during CS1's testimony, not for any other witness. CS1 is one of more than fifteen witnesses anticipated to testify at the hearing. *See United States v. Yazzie*, 743 F.3d 1278, 1288-89 (9th Cir. 2014) (upholding closure during four children's testimonies because "the district court closed the courtroom only when the child victims took the stand, unlike *Waller* where the court closed the courtroom the entire seven-day suppression hearing).

Additionally, the court could publicly release redacted transcripts of CS1's testimony after the hearing. Under these circumstances, the United States' request is tailored as narrowly as possible to protect the safety of CS1, but allow for the right to public proceedings for the remainder of the hearing.

### 3. Consideration of Reasonable Alternatives

The trial court must consider reasonable alternatives to closing the hearing. *Presley v. Georgia*, 558 U.S. 209, 214 (2010). Common alternatives to closure are delay or holding the proceeding in a different location. Neither of those alternatives would suffice under to ensure the

14

overriding interest of protecting the safety of CS1. Defendant Gatling has been the point man on the threatening intimidation tactics against CS1 as well as other witnesses. Wherever and whenever the proceeding takes place, Defendant Gatling will have notice of it and can communicate that information to the BMF. The BMF and its affiliates are known to be a widespread and pervasive criminal enterprise. Additionally, the Government considered using a disguise, or a screen to block public view of CS1's appearance. However, due to the already high level of intimidation, these alternatives would still compromise the highly probative testimony from CS1, and increase the probability that BMF could ascertain her appearance.

Thus, upon consideration of reasonable alternatives, the Government requests closure during the testimony of CS1 at the evidentiary hearing.

**4.    Findings**

The trial court must make specific findings on the record adequate to support the closure. Here, the record set forth above regarding defendants' violent criminal histories and steady stream of threats provide sufficient evidence to support specific findings justifying closure to protect CS1's safety.

In *Thompson*, the court agreed that witness intimidation justified partial closure during that witness's testimony. *United States v. Thompson*, 713 F.3d 388, 401 (8th Cir. 2013). There, the record reveals two facts that supported the decision. First, that the witness, a jailhouse informant, expressed to a detective concern for his own safety should the defendant find out he provided information. *Id.* at 391. Second, the record demonstrated allegations that the defendant "was a gang member and was involved in drive-by shootings." *Id.*

The facts here go far beyond. First, not only has CS1 expressed concern for her safety, but she has intimated that concern may cause her to forego testifying. Second, beyond gang affiliation,

15

defendants here have a clear and violent history of "silencing" by murder at least two witnesses. With the addition of the threats demonstrated above, the findings in this matter are more than sufficient to justify closure.

Thus, under the *Waller* factors, closure of the courtroom is appropriate.

## CONCLUSION

Based upon the totality of the investigation, there are legitimate and serious threats to the safety of CS1, by an organization with a track record of murdering witnesses.  Defendant Gatling's efforts to fill the courtroom with BMF/Gatling DTO affiliates is an effort to intimidate and influence the testimony of the witness, at best.  At worst, they are concerted efforts to observe and identify CS1 for the purpose of harming her. As demonstrated above, only complete court closure can ensure CS1's safety by protecting her physical appearance and identity.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

 s/ Dean R. Hoag
DEAN R. HOAG, #23843MO
MICHAEL A. REILLY, #43908MO
Assistant United States Attorneys
111 South 10th St., 20th Floor
St. Louis, MO 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

      I hereby certify that on October 13, 2016, the foregoing motion was filed electronically with the Clerk of the Court to be served by operation of the court's electronic filing system upon all counsel of record:

    JoAnn Trog
    Attorney at Law
    (Attorney for defendant Gatling)

    Preston Humphrey
    Attorney at Law
    (Attorney for defendant T. Rush)

    Bob Herman
    Attorney at Law
    (Attorney for defendant A. Rush)

    Steve Welby
    Attorney at Law
    (Attorney for defendant L. Gibbs).

                                         s/ Dean R. Hoag
                                         DEAN R. HOAG, #23843MO
                                         MICHAEL A. REILLY, #43908MO
                                         Assistant United States Attorneys